IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MOBIUS RISK GROUP, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-1708 |
| | § | |
| GLOBAL CLEAN ENERGY HOLDINGS, INC., *et al*., | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

**I.     Background**

This is a breach of contract case.  Mobius Risk Group, a Texas limited liability company, and Global Clean Energy Holdings, a Utah corporation with its principal place of business in California, entered into a Services Agreement.  Mobius agreed to manage and supervise a research and production program for using seed oil derived from the *Jatropha Curcas* plant as a biofuel.  Global Clean was to pay Mobius a fixed retainer of $45,000.00 per month for twelve months.  The Services Agreement provided for automatic renewal after twelve months, but either party could send a termination notice sixty days before the end of the twelve-month period or before the end of any six-month renewal period.  The Services Agreement also provided for termination for cause under certain circumstances.

Global Clean made the monthly payments from August 2007 until February 2008 and then stopped.  The initial twelve-month period ended in August 2008.  In May 2010, Mobius sued for breach of contract, alleging that because Global Clean failed to provide notice terminating the Services Agreement sixty days before the twelve-month period expired, the Agreement

automatically renewed for an additional six months. Mobius alleged that it is entitled to contract damages for Global Clean's failure to pay the retainer from March 2008 until August 2008 of the initial twelve-month term, and for Global Clean's failure to pay the retainer from September 2008 to February 2009 of the subsequent six-month term. Mobius also sued for fraud, alleging that after Global Clean stopped paying the monthly retainer, it misrepresented in writing that payment was forthcoming to induce Mobius to continue performing under the Services Agreement. Global Clean counterclaimed, asserting, among other things, the right to recover breach-of-contract damages for Mobius's failure to perform under the Services Agreement.

Global Clean has filed two motions for summary judgment. In the first motion, Global Clean argues that because Mobius "has no proof that it performed services under the Services Agreement" during the six-month renewal period, "the proper measure of damages for [Global Clean's] alleged breach . . . during that period is the contract price ($45,000/month) less the amount that Mobius saved by not continuing to perform." (Docket Entry No. 112, at 2.) Global Clean argues that Mobius "has no evidence of its costs to perform under the contract. Without that evidence, Mobius cannot establish its damages beyond the contract term with reasonable certainty, and a take-nothing summary judgment should be entered on that portion of Mobius's alleged damages." (*Id.*) Global Clean also argues that Mobius cannot recover damages for fraud during the renewal period because there is no evidence that "anyone at [Global Clean] ever represented to Mobius that [Global Clean] would continue to pay . . . under the Services Agreement after August 2008." (*Id.*) To the contrary, Global Clean contends that it told Mobius in July 2008 that Global Clean "did not intend to continue to pay Mobius to continue to perform services under the Services Agreement" after August 2008. (*Id.*)

Mobius responds that there is evidence in the record that it performed under the Services Agreement during the additional six-month renewal period. Mobius points to the deposition testimony of its CEO, Eric J. Melvin, and to an affidavit Melvin prepared in response to Global Clean's motion for summary judgment. Based on this evidence of performance during the renewal period, Mobius argues that it is entitled to recover the contract price. (Docket Entry No. 113, at 4–6.) Mobius also argues that it is entitled to fraud damages during the renewal period because there is record evidence that Global Clean promised payment to induce Mobius to continue performing under the Services Agreement. (*Id.* at 6–7.) Mobius points to an email it received from Global Clean's CEO, Richard Palmer, in November 2008. The email states: "Soon I hope to get you guys all caught up on payments. We are working on raising capital that should cover it all." (Docket Entry No. 113-8, at 6.)

In the second summary judgment motion, Global Clean argues that Mobius breached the provision in the Services Agreement requiring Mobius to perform "its duties . . . to [Global Clean] to the best of [its] abilities in a diligent, trustworthy, professional and efficient manner" "by failing to provide any personnel on the project who had training, experience, or skill in the subject matter of the contract—farming of Jatropha plants." (Docket Entry No. 117-1, at 3.) Global Clean contends that Mobius's "failure to perform its obligations . . . in a professional manner excuses Global's obligation to pay Mobius for the services rendered" and "entitles Global to judgment" on its breach-of-contract counterclaim. (*Id.* at 6–7.) Mobius responds that it "performed in accordance with its obligations under the Services Agreement." (Docket Entry No. 128, at 4.) The Services Agreement required Mobius to, among other things, "manage and supervise the creation, planning, construction, and start-up of plant nurseries and seed production plantations in two geographical areas", to "manage and supervise . . . the contractors and consultants selected and contracted by

3

[Global Clean] to perform" certain contractually defined tasks related to farming Jatropha plants, and to "provide certain staff in management and operations roles as requested by [Global Clean]." (Docket Entry No. 112-1, at 2–3.)  Mobius contends that it complied with these provisions because its employees "had experience managing and supervising contractors and consultants in connection with construction and other types of projects" and because it provided management staff as Global Clean requested.  (Docket Entry No. 128, at 4–7.)

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

**III.    Analysis**

    **A.    The First Summary Judgment Motion**

Global Clean's argument that it is entitled to summary judgment on the claim that it breached the Services Agreement during the renewal period is based on Mobius's stopping its performance during that period. Because Mobius stopped performing, Global Clean contends that Mobius's damages are limited to the contract price less the costs it saved by not performing. According to Global Clean, Mobius cannot establish these damages with reasonable certainty, as Texas law requires, because it has no evidence of the costs to perform. Global Clean argues that Mobius cannot prevail on its claim that Global Clean breached the Services Agreement during the renewal period without evidence of Mobius's costs of performing.

5

Global Clean supports its argument by citing Texas cases explaining when a party to a contract may recover lost profits. In a breach-of-contract case, "damages are usually measured by the 'benefit-of-the-bargain' standard, intended to put the party seeking damages in as good a position as if the contract had been performed." *C.A. Walker Constr. Co. v. J.P. Sw. Concrete, Inc.*, No. 2009 WL 884754, at *5 (Tex. App.—Houston [1st Dist.] Apr. 2, 2009, no pet.). "The benefit-of-the-bargain measure of damages may include reasonably certain lost profits." *Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). "Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost business activity, less expenses that would have been attributable to that activity." *Id.* In other words, "[l]ost profits must be based on net profits, not gross revenues." *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

"Recovery of lost profits does not require that the loss be susceptible to exact calculation. The injured party, however, must do more than show that it suffered some lost profits." *Id.* (internal citation omitted). "To recover lost profits, the party seeking them must prove them with reasonable certainty and competent evidence." *C.A. Walker Constr.*, 2009 WL 884754, at *5. "Generally, lost profits are properly calculated by deducting the costs of the injured party's performance supported by data from the actual contract price." *Bowen*, 227 S.W.3d at 96. "'However, a witness may also prove lost profits by testifying as to what his profit would have been, based on his knowledge of the cost of performance of each element of the contract and subtracting the total of such costs from the contract price.'" *Id.* (citation omitted). "What constitutes reasonably certain evidence of lost profits is a fact intensive determination. At a minimum, opinions or estimates of lost profits must be based

6

on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.* at 97 (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)).

Global Clean's summary judgment motion is based on Mobius's stopping its performance during the renewal period. If Mobius did not stop performing during the renewal period, the proper measure of damages is the contract price—the monthly retainer—not lost profits. Contrary to Global Clean's argument, there is a disputed fact issue material to determining whether Mobius performed under the Services Agreement during the renewal period. Global Clean relies on Melvin's deposition testimony that he could not identify the specific work Mobius performed for Global Clean under the Agreement from September 2008 until February 2009. (Docket Entry No. 112-8, at 23–24, 29.) But that testimony does not establish that Mobius stopped performing during the renewal period. Rather, that testimony only shows that Melvin could not recall *how* Mobius performed. Melvin testified that Mobius performed under the Services Agreement "certainly through December 2008" and that Mobius provided market-valuation analysis under the Agreement in 2009. (Docket Entry No. 113-6, at 5.) Melvin also testified that Phil Thompson, a Mobius employee hired in January 2009, performed work under the Services Agreement. (Docket Entry No. 113-7, at 41.) In addition, Melvin stated in an affidavit submitted in response to the summary judgment motion that Mobius "continued to provide services to [Global Clean] pursuant to the Services Agreement" during the renewal period. The affidavit identified some of the services provided, including "market valuation for low sulfur diesel" and "carbon credit valuation." (Docket Entry No. 113-1, at 2.)

Global Clean argues that Mobius's "alleged performance of market valuation services is not evidence that Mobius was performing under the Services Agreement" because Global Clean "did

7

not contract with Mobius to perform market valuation analysis." (Docket Entry No. 114, at 4.) According to Global Clean, market valuation "is not mentioned in the Services Agreement, and none of the valuation or market analysis services listed in Melvin's affidavit are included in the Scope of Work for which Mobius was being paid $45,000/month." (*Id.*) The Scope of Work section of the Services Agreement stated that Mobius would: (1) "manage and supervise a research and development . . . program contracted by [Global Clean] and conducted by the University of Texas Pan American . . . regarding location, characterization, and optimal economic propagation of the *Jatropha Curcas* species"; and (2) "manage and supervise the creation, planning, construction, and start-up of plant nurseries and seed production plantations in two geographical areas." (Docket Entry No. 112-1, at 1–2.) The Positions and Duties section of the Services Agreement imposed additional duties on Mobius. The Positions and Duties section stated that "consistent with the Scope of Work provided above, Mobius shall utilize commercially reasonable efforts to provide certain staff to serve in management and operations roles as requested by [Global Clean] . . . .These roles may include Chief Operating Officer, Chief Risk Officer, Vice-President Business Development, Risk Manager, Project Director, Project Developer, Project Manager or other staff that Mobius is qualified to provide and may be reasonably requested by [Global Clean]." (*Id.* at 3.)

There is a disputed fact issue material to determining whether the Services Agreement covers the market-valuation work Mobius contends it performed. The record reveals that Global Clean requested that Mobius perform two of the market-valuation services Melvin identified in his affidavit—market valuation for low sulfur diesel and carbon-credit valuation—and that these services were related to the *Jatropha Curcas* project. Melvin testified that "ultra low sulfur diesel is a reasonable proxy for biodiesel that would be generated using" *Jatropha Curcas* seed oil.

8

(Docket Entry No. 113-7, at 6.) Melvin explained that "the Jatropha oil [was] being looked at as ultra low sulfur diesel for revenue purposes" to provide Global Clean "with some indication of . . . the . . . potential revenue streams that they would have." (*Id.* at 17–18.) Melvin also testified that "the availability of carbon credits for Jatropha-based biodiesel" was "an additional asset, additional revenue item." (*Id.* at 29–30.) Melvin testified that Palmer, Global Clean's CEO, requested that Mobius analyze "the potential carbon credits that exist in Jatropha-based biodiesel." (*Id.* at 31.) These market-valuation services are consistent with Mobius's duties under the Services Agreement to provide risk management and business-development services, as requested by Global Clean. They are also consistent with Global Clean's "stated objectives" in the Services Agreement not only to produce seed oil from *Jatropha Curcas* plants, but also to sell seed oil, "along with other related byproduct commodities including seed meal and plant-based biomass." (Docket Entry No. 112-1, at 1.) Drawing all reasonable inferences in Mobius's favor, there is sufficient record evidence of performance during the renewal period to defeat Global Clean's summary judgment motion.

Global Clean has also moved for summary judgment on part of Mobius's fraud claim. Mobius alleged that after Global Clean stopped paying the monthly retainer, Global Clean misrepresented in writing, including during the renewal period, that payment was forthcoming to induce Mobius to continue performing under the Services Agreement. Global Clean argues that Mobius may not recover fraud damages during the renewal period because Global Clean told Mobius in July 2008 that it was cancelling the Services Agreement. Global Clean points to an email and a letter from Bruce Nelson, Global Clean's CFO, to Casey Ragsdale, Mobius's vice-president. The email stated that Global Clean does not "have the available cash to renew the Mobius agreement" and that Global Clean would not be renewing the Services Agreement "at the end of

9

August 2008." (Docket Entry No. 112-2, at 2.) The letter asked Mobius to "consider" the email and the letter "as written notice of cancellation of the Agreement due to lack of funding" under the Services Agreement's for cause termination clause. (*Id.* at 1.) Based on the email and the letter, Global Clean contends that "Mobius cannot prove it relied on any representation from [Global Clean] or that it suffered any damage in reliance on any representation by [Global Clean]" during the renewal period. (Docket Entry No. 112, at 6.)

Though the issue is close, Global Clean is not entitled to summary judgment on the fraud claim. The record reveals that Palmer sent three emails—in May, June and November 2008—assuring Mobius that Global Clean would pay the $45,000.00 monthly retainers that Global Clean had stopped paying in February 2008. The emails stated that the retainers had not been paid because Global Clean was waiting to be paid on other contracts. Palmer sent the last email in November 2008, after Nelson sent the July 2008 email and letter. In the November 2008 email, Palmer stated: "Soon I hope to get you guys all caught up on payments. We are working on raising capital that should cover it all." (Docket Entry No. 113-8, at 6.) This court has previously held that based on the three emails and Palmer's deposition testimony, "[t]here is a plausible basis to infer that Palmer represented that he and Global Clean intended to pay Mobius the full amount due under the contract to induce continued performance by Mobius in spite of Global Clean's failure to pay the past due monthly retainers. There is also a plausible basis to infer that Mobius relied on Palmer's representations by continuing performance despite nonpayment." (Docket Entry No. 61, at 9.) The latter inference is buttressed by the summary judgment evidence discussed above showing that Mobius performed under the Services Agreement during the renewal period. Palmer's November 2008 email and the evidence of Mobius's performance after August 2008 create a fact issue material

to determining whether Global Clean misrepresented to Mobius that payment was forthcoming to induce Mobius to continue performing during the renewal period. Global Clean's first summary judgment motion is denied.

### B. The Second Summary Judgment Motion

Global Clean argues that it is entitled to summary judgment on Mobius's breach-of-contract claim because the record evidence establishes as a matter of law that Mobius breached the Services Agreement's requirement that Mobius "perform its duties, responsibilities and functions to the best of [its] abilities in a diligent, trustworthy, professional and efficient manner." (Docket Entry No. 112-1, at 3.) According to Global Clean, Mobius breached "by failing to provide any personnel on the project who had training, experience, or skill in the subject matter of the contract—farming of Jatropha plants." (Docket Entry No. 117-1, at 3.) Global Clean relies on the deposition of Juan Cruz, Mobius's project manager during the Services Agreement's initial twelve-month term. Cruz testified that no Mobius employees had experience with planting, with running a commercial farm, or with *Jatropha Curcas* plants. Cruz testified that Mobius's inexperience delayed the startup of Jatropha plant nurseries and seed production plantations. (Docket Entry No.117-1, at 56–57, 60.) Global Clean cites Texas cases involving contracts for professional services and imposing "a common law duty to perform the work agreed to be done with care, skill, reasonable expedience and in a good and workmanlike manner." *Moody v. Messer*, 489 S.W.2d 319, 321 (Tex. Civ. App.—Corpus Christi 1972, no writ).

Contrary to Global Clean's argument, the Services Agreement did not require Mobius to provide personnel "who had training, experience, or skill . . . farming . . . Jatropha plants." (Docket Entry No. 117-1, at 3.) The Agreement required Mobius, among other things, to "*manage and*

11

*supervise* the creation, planning, construction, and start-up of [Jatropha] plant nurseries and seed production plantations in two geographical areas" and to "*manage and supervise* activities in the selected geographic areas, as well as the contractors and consultants selected and contracted by [Global Clean] to perform" certain contractually specified tasks related to farming Jatropha plants. (Docket Entry No. 112-1, at 2 (emphasis added).)  Melvin testified, and Global Clean does not dispute, that "Mobius has experience in managing contractors and consultants related to a myriad of different activities," (Docket Entry No. 112-8, at 13), and that Mobius provided employees with management and supervisory experience to work on the Jatropha project, (Docket Entry No. 128-6, at 10).  Based on the current record, Global Clean is not entitled to summary judgment on the breach of contract claim on the ground that Mobius failed to provide employees who had experience farming Jatropha plants.  Because Global Clean is not entitled to summary judgment on Mobius's breach of contract claim, it is also not entitled to summary judgment on its own breach of contract counterclaim.  The second summary judgment motion is denied.[1]

## IV.  Conclusion

Global Clean's motions for summary judgment, (Docket Entries No. 112 & 117-1), are denied.

SIGNED on May 14, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

[1]  In light of this ruling, Mobius's motions to strike certain evidence Global Clean attached to its second summary judgment motion, (Docket Entries No. 129 & 132), are denied as moot.